Ms. Dorsey for the appellant. Ms. Amari for the appellee. Good morning. Judge Henderson is participating by audio this morning. You may proceed. Good morning, Your Honor.  Judge Henderson is participating by audio. I wouldn't worry too much about the 15-minute limit, either. We'll just keep asking questions until we're satisfied. Thank you. Good morning. Kathryn Dorsey on behalf of the defendant's appellant. The government here, Your Honor, has shown a likelihood of success on the merits first day. The government is not preventing, blocking, or imposing any obstacle on Ms. Doe's pursuit of an abortion here, such that it could constitute an undue burden within the meaning of Casey. The government has not put any obstacle in her path. Rather, the government is refusing to facilitate an abortion, which it is permitted to do in furtherance of its legitimate and significant interest in promoting health. So you seem to have three different strands of arguments, if I could set them out as I see them. One is the facilitation argument. You don't want to be facilitating the abortion. One is that it's not an undue burden, or second is that it's not an undue burden because she can return to her home country. And the third is that it's not an undue burden because she could be released to a sponsor. And I want to explore the sponsor option quickly here at the beginning, which is we're being pushed in a span of 24 hours to make a sweeping constitutional ruling in one direction or another. And when that happens, the Supreme Court and this court often look, are there other avenues to resolving a dispute short of that initially? And it seems to me in this case, if she were released to a sponsor, that would solve the government's objection. That would allow J.D. to be released from custody, which presumably would be a good thing, and would allow her to obtain the abortion if she so chooses. The sponsor option, as I read the record, hasn't been explored. In this paragraph 21 of the White Declaration, I have no idea what the facts are behind that. There was no exploration of that. There's been very little explanation of that. My understanding is that the sponsor can occur quickly. What is the status of the sponsor situation? How does it work? How quickly could that happen, and wouldn't that resolve this case if it could happen quickly, without the need for the ruling that either side is pushing for here? The bottom line answer, Your Honor, is yes, if it could happen, that would resolve the case. Now, in the record, there is not much on this, admittedly. I think, as you pointed out in the White Declaration, there's indications that ORR and HHS have pursued the sponsor option. I think she identified a couple people as potential sponsors. I'll just ask a factual question, which is not in the record. Did she have names of people and phone numbers and addresses with her when she arrived in the United States? Again, not in the record, but I believe there was at least one individual who she had contact information. Does she have other relatives in the United States? That I don't know of, not that we are aware of, I think, and not that is in the record, of course. That's my concern here, is that that option, which is an option that solves her problem and solves the issue, hasn't been explored. It's one that I would think, if it was an option, that plaintiffs would have raised to help because of HHS. Yes, excuse me, I'm going to ask the same questions of them, too, but it just seems to me that that's something that is a way to resolve this case in a way satisfactory to everyone and quickly, and we just don't have facts on it. Absolutely, and HHS remains willing to work with that. It does take some time because sponsors have to usually undergo a background investigation, and so there are some procedures that are laid out on the website. We've cited our brief ORR procedures. It goes through the background information, but I would assume that could be done fairly quickly. Well, I guess the record fairly quickly matters, and we're at a point where days matter. But my understanding is that there were two sponsors that have already been rejected.  That's my understanding, Your Honor. And were those ones that she or her attorneys or somebody identified? I believe so, but I think plaintiffs might have better information on that. Do you know why they were rejected? I do not know. I don't know. It may have been that they were unwilling to serve as sponsors, but I'm not sure on that. Do you know whether a sponsor is willing, given some of the documents in this record? We don't have much record, but there are some documents and e-mails in the record. Do you know whether a sponsor's willingness to permit her to have an abortion is a factor in the decision to approve a sponsor or not? I do not know, Your Honor. So you cannot represent that this is not a consideration? I mean, I cannot. You're out on the record. There are e-mails that talk about if something doesn't work, we have. I don't think it's hard to tell, given their alcohol use, but that if a sponsor doesn't work, we know lots of folks who are willing to help and support a pregnancy. Correct, Your Honor. Would it be unconstitutional if sponsors were denied that status because of their willingness to support an abortion decision? Would you agree with that? Your Honor, I think that would be whether that's – I'm sorry. Are you saying if HHS had a policy in effect, basically, that they wouldn't allow a sponsor to sponsor an individual? It's a policy or even a one-at-a-time decision. They decide, say, I know this is the record, so I'm not trying to put anything in there that isn't. But if it were the record, that she came forward with a sponsor, and the sponsor is willing to support her decision, and it sounds like they have some sort of discretionary judgment here, and they decide that it's not consistent with their standards to release a minor in the custody of someone who allowed abortion to occur, would you agree that that would be an unconstitutional undue burden? That would certainly present a much closer question. Would you agree to that? Well, I don't – Your Honor, it's not on the facts here before, so I would be hesitant to take a position that it would definitively be an undue burden, but I think it would definitely present a very close case because that would be – It doesn't feel like a close case to me, actually. Putting an obstacle in the path by the government. Right. How would that not be an undue burden? I think it likely would be, Your Honor. And if it were, you would only have your argument that the return to the home country argument, you wouldn't have the sponsor. As of now, you have two alternatives. You've identified return to the home country and the sponsor. If Judge Millett's hypothetical came to pass, presumably that would be – there would only be one option, the return to home country, and we would have to assess whether that's a constitutionally sufficient option. I wanted to ask a question. Can I ask a question about the facilitation argument? Can I get in here for one second because I'd like to ask Ms. Dorsey, I agree with my colleagues that we should avoid constitutional issues if possible, but I would like to know if you have a position on the constitutional rights of Jane Doe, and if so, what is that position? If you're asking whether we have a position on whether she has a constitutional right to abortion by virtue of her status here illegally, we have not taken a position on that, Your Honor, and we are not – How can you not take a position on that? Because, Your Honor, we don't think it's necessary to deciding the issue here because we're saying that even if she has a constitutional right to abortion, this – what's happening here is the government's refusal to facilitate, and that is not an undue burden. That is different under cases like Webster and Maher and McRae. Can I ask you a question on the facilitation point, which is women in federal prison, under Supreme Court precedent, do they have a right to obtain an abortion? Yes, and the reason that is different, Your Honor, is because by the fact of incarceration, there is no other way a woman can obtain an abortion, and it's established under Supreme Court precedent that she has such a right. But here, Ms. Doe has the option of voluntary abortion. Okay, but I just want to isolate your different arguments. That's why I started with the three. In that hypothetical I gave – it's not hypothetical, it happens – there is still government facilitation by your definition of facilitation of the abortion. Sorry, Your Honor, I think I – In the federal prison situation, the government is, under your definition of facilitation, facilitating the abortion. Yes, and in that case, the government would have to, because there's no other way she could get it, and otherwise the woman would be completely denied of a right, which would obviously put her under burden. Let me ask you another question similar. But adults who are here in the country unlawfully and who are being detained, an adult woman who's pregnant in immigration detention unlawfully here, does she, under current Supreme Court precedent, have a right to obtain an abortion? Again, we haven't taken a position on whether, but I think there are procedures that are – That must be happening as a matter of practice on an ongoing basis. Is it happening? Are adult women in immigration detention who choose to have an abortion able to obtain an abortion? Well, plaintiffs have cited, I believe, a policy, at least at ICE, when individuals are in ICE custody, they are able to obtain an abortion that ICE does facilitate transporting a woman from abortion, although I think as long as they're not federally funded. Plaintiffs cited the ICE guidelines, which seem to suggest that. You're not disputing that that happens? No, we're not, Your Honor. And if J.D. had come into the country unlawfully and committed a crime and was in federal prison, she would be able to obtain the abortion? Yes, but it's not – Your Honor, although that is facilitation, that doesn't necessarily mean that that is constitutionally required. I understand, and I'm – I'm sorry to interrupt. I'm sorry to interrupt. I'm just isolating the facilitation part of your argument from the undue burden part of your argument. It just seems that there is facilitation by the government in these other examples, and you would argue, well, that's different because there are other alternatives here, and I'm not sure that distinguishes the situation as a matter of facilitation. It may distinguish it as a matter of undue burden. Right, but the government could still make the decision here to choose not to facilitate, to take affirmative measures to help her when they are trying to promote a policy. And because, in your view, it's not an undue burden, and it's not an undue burden because, in your view, there are two alternatives, the return to home country and the sponsor, right? That's correct. On the return to home country – Go ahead. I'm sorry. So I'm trying to understand what the governmental interest is in your terms, if I take your language of facilitation, in not facilitating abortion for J.D., but facilitating it for adults who I assume could also voluntarily depart. What is the rationale for that? Well, the rationale here is they're trying to promote childbirth and fetal life, and also they are looking over the best interests of the child, where HHS is – Which child? The minor child. The minor child in HHS custody. J.D.? J.D. Well, she got a judicial bypass, which is a decision that she gets to make best interest for any guardian or custodian, so they don't – Well, the judicial bypass system, Your Honor, that takes care of the state's requirement to bypass parental consent provisions. HHS still has an independent custodial obligation over J.D., and it has an own interest in securing her best interest and taking care of her. And, in fact, you – So they have an interest – It doesn't override. It doesn't override. It's just independent. No, Your Honor. This is determination that she can make this decision. So she needs a judicial bypass that covers the federal government as well as the state? No, Your Honor. If she were – The only reason she can't exercise that judicial bypass procedure right now is because she is in HHS custody by virtue of the fact that she's here illegally. Otherwise, if she were here and she obtained a state bypass, there would be no problem with her going in Texas to have an abortion because she has the judicial bypass. I guess I'm not understanding why – The whole difference here – The only difference is that you assert a best interest that trumps her decision to make the – She got the judicial bypass to make the decision to have an abortion without requiring the consent of her guardians or custodians or parents. And your position is that you have an interest that's greater than that, and that's the only thing that distinguishes your treatment of adults and minors in immigration custody. No, Your Honor. Respectfully, I don't think that's quite exactly what I'm saying. The HHS interest here doesn't trump, but it's an independent interest of that of the state and the state procedures requiring parental consent for a judicial bypass. But there's no bypass process for bypassing. This custodian, you're telling me. No, I'm not. That's because her bypass process to that, because she's in HHS custody, would be to choose to voluntarily depart, which would – then she'd be out of custody. She'd be like any other person in the state of Texas who could obtain – who's obtained a judicial bypass, and she'd be free to pursue. She'd be in the same position as somebody like that because she'd be out of custody. Could the state of Texas pass a law under your theory that says that no hospital, clinic, doctor may perform an abortion on a woman who's not in the country lawfully, on the theory that she can return to the home country? Thank you. Whether that would apply to all doctors in the state or just states? No. If you're unlawfully in the state of Texas, the state of Texas passes a law that says you may not receive an abortion in the state of Texas as an unlawful immigrant on the theory, I'm asking how far your theory goes, that they can return home. I think that runs into a problem of not only the undue burden, but then the argument that the states have raised in the amicus brief about whether there is a constitutional right to an abortion for an illegal alien. So I think that would – That's the question. That's Judge Henderson's question. Right. And, Your Honor, we haven't taken a position on whether, and we don't think this court needs to reach the issue of whether she has a constitutional right here. What if a judge on this court or on the next court thinks you need to have a position on that issue in order to resolve the case? Then I guess I would request that we have an opportunity to brief that issue, Your Honor, because the government has not taken a position. We don't have the time for that. Since you're assuming and not disputing that there is that base constitutional right, then we should assume there is that base constitutional right. I think that's fair, Your Honor, because we haven't disputed that here. You're waiving any argument to the contrary. We've assumed for the purposes of this argument that even if she had such a right, it's not facilitation. And you're waiving any argument to the contrary. Yes, Your Honor. You're affirmatively waiving that argument for purposes of this entire litigation, including in the Supreme Court? Well, we haven't raised it here, and we haven't made the argument, so I'm not sure we could do otherwise, Your Honor. There's sometimes a difference between forfeiture and waiver, and Judge Millett used the precise word, waiver, and I want to make sure before we have a rehearing petition or something. Your Honor, I would prefer not to waive it, but I understand you've made the argument here. Well, isn't that waiver? That's forfeiture. I would agree with Judge Kavanaugh, Your Honor, that it's forfeiture. It's now a knowing and intentional decision not to raise, so it's hard to figure out how it's not only forfeiture but also waiver. But if you have a legal theory, I'm most open to hearing it. Your Honor, I am not authorized to take a position on that issue, and here we have not disputed it. We have assumed for purposes of the argument that if there is a constitutional right, this still does not constitute facilitation. Now, what would be your position, Ms. Dorsey, if we asked you to brief that issue? I don't hear your answer to that. I don't know, Your Honor. Of course, I do not make these decisions all by myself as a government, and I would have to get authorization for whatever position we would take. I understand that. Let me ask you another question, Ms. Dorsey, and that is the district judge, I want to ask you about the medical care that the government is required to give a minor in one of these shelters. The district judge made what I think is an appalling comparison between an elective abortion and a tonsillectomy. I'm asking you, do you have a position if this were a medically necessary abortion? I'm sorry, if this particular procedure is medically necessary? Yes. There is nothing in the record to indicate that an abortion here is anything other than elective abortion. There's nothing to indicate that it's medically necessary here. I think her question is, go ahead. What I'm asking you is, if you do have a position, if you don't, okay, what would be your position if it were medically necessary? Well, if it's medically necessary, there is an exception in the HHS policy, and that indicates that you have to seek ORR director's approval for significant surgeries such as abortion, but there is an exception if a procedure is medically necessary. Okay, thank you. How many pregnant minors are in ORR custody at the moment in the United States? I do not have that factor on it. Do you know what medically necessary means in that regulation? There is, I think, an additional emergency exception. Okay, so there's not a medical necessity exception? I think it's referred to as an emergency exception. Are we sure that emergencies include medical necessity? I'm just asking because there are constitutional cases and there are rules about what counts as medical necessity and not for purposes of the constitutional right, and so I'm very trying to understand, is there any framework in place for that decision to be made? There is just a policy that states that if it is an emergency, which I would think would include medical necessity, then the ORR director's approval is not needed and they should take the minor for necessary medical care. There's also a lot of documented problems about sexual abuse within detention facilities, including ICE ones. What if she had gotten pregnant as a result during detention? What would your position be? There's a different policy in place for that, and that does, which I believe is cited in our brief, or at least plaintiffs, which indicates that she is to be allowed to have an abortion and medical services for family planning and the like to make a decision in that case. No, but I have to make a decision. And to facilitate it if she chooses to have an abortion, yes. Or you can tell me on rebuttal if you don't want to waste the time now, but that is, is that any rape, or is it only a rape in the facility? I don't think it's limited. I think it's limited to rape or sexual assault. I don't think it's specified that it has to be in the facility, because I think that's envisioned to cover women who have problems on their route to the United States and may get impregnated by rapists. And so if she were to show that this was a non-consensual impregnation, she would be able to get her abortion? If it was in case of rape or sexual assault, yes. What else is not, I mean, non-consensual? No, that's right. Any non-consensual. That's my understanding, yes, Your Honor. Does J.B., under your view, though in the country unlawfully, qualify as a person under the due process clause? I think so, Your Honor, though of course that may tie in with the question that the United States is not taking a position on. So you're not taking a position in their context that children who come here are persons within the meaning of the Fifth Amendment? I believe that's right, Your Honor. So they are? Yes. Thank you. Do you want to talk about the voluntary departure period? Yes, Your Honor. Our position is that because she can choose to, her sole need here that she alleges why she needs the government to assist in getting an abortion is because she is in HHS custody, but she can file a request for voluntary departure at any time, and then she is not, she's in the same situation as anybody else, not in government custody, and the government, therefore, would have no need to take affirmative steps to help her get an abortion. That would be clear facilitation in the line of cases like Webster and Maher. Plaintiffs say that's, in essence, imposing a penalty on the constitutional right that the Supreme Court has articulated. What's your response to that? It's not imposing a penalty. She doesn't, she came here, and because of that, she is in federal detention, and she has the choice to voluntarily depart, and even if that puts her to a difficult choice between voluntary departure and not being able to obtain an abortion, that's not a substantial obstacle that the government has put in her way, especially since she has raised no legitimate claim to remain in the U.S. And so if she, if she were to claim asylum, that she would be persecuted if returned to her country, what then? That would be a much more difficult case, Your Honor, but she has not raised any such claim here. No, no, no, but again, you asked us to make constitutional rulings in this case, I feel in here, and so I need to understand what your position is when you say what you mean by this, you can leave. So what if she claims that she would face persecution? Is it still her choice or not? I think that situation is still her choice in that we have not placed an undue burden on her. An undue burden. It's not a government obstacle placed on her, even though that would obviously be a more difficult choice and I think would make a harder question. Well, suppose that, and Judge Millett's hypothetical, that in essence made return to the home country not an option. Then she's in the same position, I would gather, as someone who's in federal prison, who you said does, under current Supreme Court precedent, have a right to an abortion. Although there are constraints on, as I understand them, I'm no immigration law expert, but constraints on how long we can detain somebody under a Zadvydas and other cases, and so it might not be an issue that she could permanently be detained to be equivalent to a prison case, Your Honor. I think I know the answer to this question, but is the government trying to remove her back to her home country? I don't know that there have been affirmative efforts to remove her. She's in the state where she can request voluntary departure, but I'm not aware, and there's nothing in the record about removal efforts. She, it seems by the facts in this case, would be someone who would be entitled to claim the special immigrant and juvenile status. I don't know, Your Honor. So that's a protected status for those facing child abuse in the country from which they've come. Is it your position that federal law would actually allow the United States to just, when you have an unaccompanied minor who has, at least at this point, undisputed claims of severe child abuse, would you be allowed to remove her without any process? I'm not saying voluntary departure. I'm saying would you be able to remove her as an unaccompanied minor, just put her on a plane back to where she's from, given these allegations of abuse? Well, but she hasn't made those allegations. I'm just asking how the system works. For unaccompanied, not adults, we're talking about unaccompanied minors here. For unaccompanied minors, can the government simply put someone, you say she hasn't invoked a protection yet. Right. Can't you just put her on a plane and remove her? Well, usually the protections that, you know, we have obligations for cat claims and the like, where we have non-ruleful obligations, but again, those haven't been raised here. Right. So why can't you just put her on a plane yourself? Why does she have to voluntarily depart? Well, removal might be another option. But why can't you do it? So you can do it. You just have chosen not to do it. I think that's right, but, Your Honor, I actually do not know the answer to that question. Can I ask you, Ms. Dorsey, do you, in this option to return to her home country, do you consider whether abortion is illegal in that country?  I mean, the voluntary departure option, that's her choice, regardless of whether back home her country makes an abortion accessible or not. Do we know what country she's from? I was searching for that. We do, but I think it's in a sealed record, Your Honor. And do we know if the country she's from allows abortion? I believe it does not. It does not? Yes. Just to be clear, if she were to assert that she was pregnant as a product of non-consensual sex, do you agree that she can receive the abortion? That's correct, Your Honor, and I will get you that study on the dental. And on this facilitation thing, can you explain to me, given that she's in the, she's actually not directly in your custody, she's in the custody of a grantee who just has no opposition to letting her go, other than your threat to take, not your personal threat, the government's threat to take away funding if they let her go and have the abortion. So tell me exactly what it is the government, other than not pulling funding from the grantee, what exactly is it that you, the government has to do to facilitate her abortion? There are several steps, Your Honor. First, for a minor in the custody of the shelter, the director of ORRR has to give written approval for abortion or other electrosurgical procedures. So that would be the thing that there's no legal mechanism for anybody to bypass. Minors just can't bypass that. That abortion restriction can't be bypassed. Correct, because that's an HHS, that has nothing to do with the state bypass. No, no, I'm just saying that I think the federal government can impose legal constraints like that that can't be bypassed, even though states are not permitted to do so. Well, there is a, I mean, there is a similar bypass mechanism in that, if it's in case of emergency or medical necessity, that is a minor. That's not the same thing as a bypass. Well, it's not. But it's not a parental consent requirement, either. It's somebody who is considering. It's a personal consent requirement. That's correct, Your Honor. Okay. Then, normally, what would also happen is they would have to set up appointments and transfer her, transport her to those appointments. No, they don't have to transport her. I realize in this case, there are volunteers to transport her. But then they still have to arrange transfer of custody because they're not allowed to do that. No, no, no, HHS is a grantee. It's a grantee through orders of HHS. No, I know. The grantee does all the paperwork and does it routinely for medical assignments. Right, but HHS has to give instructions to how this all happens. There's already a system in place by which the grantee, my understanding from the program and regulations and policies, is that the grantee does all of this. HHS doesn't have to do anything of logistics other than not stop it. Is that correct in this case? Well, they are implementing the HHS. The grantee does it on behalf of HHS. They are acting to undertake these responsibilities. And so they also have to... Is the grantee HHS? Is it actually a federal actor, a contractor? It's a contractor is my understanding, acting on behalf of HHS. Does the Constitution apply to HHS? Does the Constitution apply? Applies to contractors? Yes. All right, so the point is you have to allow... And you have a court order. Assuming you have a court order that said she's entitled to this. Right. So you have to... Because they're not allowed to let somebody out of custody without making a transfer, but there's somebody authorized to take custody. So, in this case, an attorney of record. You don't get to see that. No, an attorney of record, guardian, and late appointment. And did it yesterday. That's right. Did it yesterday. And then they have to... When after the procedure, they obviously... The shelter has to monitor her health and take her for any follow-up appointments or if there's any complication, has to give all the care that would be required. And this is only... Okay, so all we have to do is take care of her health, which I have to do anyhow. Yes, although, of course, there could be different post-surgical complications or different needs, then they are required to enforce the agreement to do basic health, but it doesn't necessarily require them to undertake the complications post-elective surgery. So the one health care they're not willing to do is for abortion. They'd be willing to do anything if she were to continue the pregnancy. They'd do all the facilitation should we continue the pregnancy. It's only an administrative burden if it's to allow her to exercise her right to an abortion. And it's important. Well, they would... It's not just because there's... They don't need to facilitate on for... for an elective abortion when they have a legitimate interest in promoting childbirth. So, yes, they can choose to take additional measures to promote childbirth and be happy to provide any extra care that that might entail. But the fact that they choose not to do so for an abortion, that is in line with the governing law... For a minor. For a minor. It is in accordance with the governing law in cases like Maher and McRae and Webster, which say that, you know, the government, there can be funding... So... Well, none of them involve attention. No. None of them involve attention. So if you're... Your theory is articulated in the papers was that you would be okay if she's released to the sponsor and then she presumably would choose to have the abortion. But if she's released to the guardian ad litem and chooses to have the abortion, that's not okay. And my question is, what's the difference in facilitation between those two situations from the government's perspective? Because then the government has to have a role in the process of approving the abortion, to let her go for that, and in providing health care afterwards. You know, taking out here, she says she can be taken to it and paid for the procedure, but it would still... The government would still have to approve the procedure, which it has a reason, a legitimate reason not to approve. What do you mean by approve the procedure? What do you mean by... ORR has to... The director of ORR has to approve. Well, there's nothing looking at the procedure itself. It's just saying, I agree, it's okay if you go get your abortion after the approval. Well, you have to approve it, give a written approval. I would assume that looks at the procedure and whether it's in the child's best interest and... But there's not much in the record on that, Your Honor. But there is an approval that the government has to go through to facilitate the abortion so that can happen, and it also has to provide any care for her after the abortion in this case. Okay, just to be clear again, the approval is... You've already had a judicial bypass that says she can make this decision herself, not her custodian. She's got a guardian ad litem that agrees. And your position is that facilitating would be ORR saying, okay, we're going to let you exercise your choice. That's it. No, ORR... I put it aside after the abortion. Right. That's beforehand. ORR's policy, the policy is that it requires a written authorization for significant medical and surgery procedures. And so in the case which includes abortion, any services that may threaten the life of the unaccompanied minor. And so they would have to undertake that written authorization and actually approve her to go get an abortion as a surgical procedure. Right. I'm sorry. I don't understand what the approval is. It's just that we agree that you can get abortions. To agree that that procedure is appropriate for the minor is in the minor's best interest. Okay, so that's just another best interest determination that can't be bypassed at all under your procedure. Unbypassable best interest determination. In an emergency. Unless she's going to die. Well, I'm not sure it goes that far, but... Well, what else would it include? Emergency, it wouldn't necessarily be death, I would think, but there could be other risks to her life, or if it was going to endanger her health, I would assume that would qualify for an emergency, Your Honor. Okay, why don't we hear from Plants, and we'll give you time on rebuttal. Plants, one quick question. Do we know when she turns 18, when she's 17? I do not know, Your Honor. It's not in the record. Do you know outside the record? Does the government know that information? It may be in concealed documents, but I'm not sure we have an accurate first date. Is that something you can provide to us on your show? Yes, after the emergency. Thank you. May it please the Court, good morning. Since 1973, the Supreme Court has held that the government may not ban abortion. By refusing to transport J.D. for an abortion, or refusing to allow anyone to transport J.D., including the shelter or her guardian ad litem,   The Supreme Court has ruled that the government We're not asking for a sweeping constitutional ruling. We're asking for basic validation of what the Supreme Court has already said for 40-some-odd years, and that is the government may not block abortion for anyone. They may not veto abortion. The Supreme Court has been clear that no one may have a third-party veto power over anyone's abortion decision, including a parent or a husband. This arises, as you well understand, at the intersection of two complicated areas of law, undue burden abortion law and immigration law, both of which have their nuances, as you're well aware. And there are two principles, I agree, that both sides seem to agree on under current Supreme Court law. The government can't block the abortion. At the same time, I think you acknowledge the government's not required to pay for, provide, or assist the abortion in some direct way, under your view, under current Supreme Court law. And my question, I'll start with you, as I did with the government. Doesn't the sponsor option, if it's effectuated, resolve the case in a way that satisfies both the not block the abortion and not pay for, provide for the abortion in a way that also gets J.D. out of detention and therefore seems like a best-case resolution of this if a sponsor were available? Your Honor, I know we will talk about facilitation in a minute, but I just want to make clear that Plaintiff's position in terms of payment for the abortion itself is well settled under Supreme Court precedent, but that is the limit in terms of what we agree that is the limit with respect to government. That's an important clarification, thank you. But what about... For sponsors, Your Honor, I agree it's not on the record, and J.D. does have attorneys that are helping her with the immigration status. There are a couple of sponsors that have been identified, extended family members, and my understanding is that this is something that they are trying to pursue. Well, if it could be done by Tuesday, for example. Your Honor, I'm not sure that... Or Friday. And we have a couple weeks at most, and I realize you're going to say correctly that each day matters, and I understand that, completely understand that. But if the sponsor could be identified as quickly a sponsor, isn't that a best-case scenario for J.D.? Because J.D. has a sponsor then, and can also, if she chooses, obtain the abortion that she has so far elected to have. I have no doubt that J.D. would rather be with an extended family member than be in a government-funded shelter, but I understand that that process takes a significant amount of time. There must be a vetting process with the sponsor, a home visit. My understanding is it could take months. But here's my concern, as I expressed to the government as well. We don't know whether what you just said is accurate in this case. We just have no idea. We have one sentence in a declaration, no fact-finding from the district court, no idea in this case who those people you've just mentioned are, whether it would be three days or three months, in which case three months we'll have to confront the issues, if three days, maybe not. And we just have no idea. Shouldn't we have some fact-finding on that question before we go headlong into these difficult issues of immigration and undue burden law? Your Honor, I don't think you need to, because the constitutional violation here is so clear. This court should not set aside its obligation to enforce the Constitution by the possibility that JP may have a sponsor that the ORR will approve and properly vet today for constitutional rights are being violated. I'm sorry to interrupt. On possibility, you may be right that it's a mere possibility, but you may not be right. If there were fact-finding that said, actually it's not going to happen, that's one thing. If there's fact-finding that says, yes, it could be done in six days, that's a different, potentially different result. If there's fact-finding that says we don't know, then we'd have to confront that. We just don't know whether what you just said is what the record would show if there were some fact-finding on the sponsor thing. And no doubt if we, just hypothetically, this is not trying to explore all options here. We've had 24 hours on this. But hypothetically, if we were to get more facts on that question, it could narrow the issues before us and also help JD. As you said, it would be better for her to be with a sponsor than to be in a government immigration detention facility, correct? Yes, Your Honor, but I do think that one thing we do know is that she has been in legal custody of ORR for a number of weeks now, and there have been some sponsors that have been identified, and there has been no actual sponsorship that has happened. So we do know that this has been a process that has been worse for weeks. I'm sorry to interrupt again, but we don't know why. We don't know what the status is. We don't know with a little nudge from the court that that wouldn't happen more quickly, that it couldn't be effectuated more quickly, both from the government side and from the sponsor, JD's attorneys, and people assisting her side to get it done. We don't have those facts on the record. We do know that two sponsors already have been rejected or fallen through. Have they withdrawn, or did they get rejected by ORR? Your Honor, I'm not aware of those circumstances. The immigration lawyers and JD's guardian have been working on that issue, and I'm not sure of the accuracy of that statement. My understanding is that there are still avenues to pursue with respect to sponsors. Where was she detained? Your Honor, I don't know. She was in the United States, though. Not at the border. She may have been at the border, but she was in the United States. She may have been at the border. She was entry without inspection. Sorry? She was entry without inspection. And did she have, to your knowledge, names of people with her? I don't know, Your Honor. I do know that she has identified at least two extended family members who may be potential sponsors. Do you know if she knows other people in the United States other than those two? Other than those two, I'm not sure if she has extended family members or knows anyone that has a connection to her that could be a viable sponsor. Is she in school? I don't believe she's in school, Your Honor. My understanding is that she's under close supervision in the shelter and is really only allowed to leave for medical appointments. Okay. Just on the legal side now, so obviously my colleagues can jump in with more factual questions, but on the legal side, does it matter at all from your point of view that she's in the country unlawfully? No, Your Honor, it does not. The Supreme Court has said that the Due Process Clause of the Fifth Amendment applies to all persons in the United States, and the right to abortion is grounded in the Fifth Amendment Due Process Clause. And so there is no reason why her immigration status should be diminished or should diminish her constitutional right to access abortion. And I think we heard the government saying that they are not taking a position on that. And so I agree that we should assume for the purposes of this litigation that it does, and we should follow what the Supreme Court has said with respect to access to abortion, and that is that the government may not ban abortion for anyone. So I think the government would say, or does say, that suppose she had been detained at the border but not in the United States before she entered, she would have been sent back presumably to her home country. And the government's theory of this, as I understand it, is that that's the same position she would be in now. But that's not the position she's in now, Your Honor. I do know that deportation proceedings have not begun against her. She may very well have defenses against those deportation hearings. She should not be forced to give up the right to make those defenses simply because she has exercised her constitutional right to seek an abortion. That would be a penalty on access to abortion, just like it was in Shapiro v. Thompson when the issue was people coming to different states needing to establish residency before accepting welfare benefits. The argument there could have been, well, people could have just gone back to the states that they came from. They don't need to stay here in our state and get our benefits. But that's not what the Supreme Court said. The Supreme Court said you cannot penalize people for exercising their constitutional rights, and that would be what would happen if the government was allowed to use the excuse of voluntary deportation to avoid their constitutional obligations to J.D. If people in the country, without documentation, are not persons of the Fifth Amendment, then that would go beyond minors. It would be all adults, whether in custody or allowed into performation, whatever it's called, released out into the United States, correct? Yes, Your Honor. The Supreme Court has... All dreamers? Yes, Your Honor. And the Supreme Court has also never taken that position, that individuals here without documentation are not entitled to Fifth Amendment substantive due process protections. That's not the position in this litigation? Correct. So, Your Honor, do you... No, no, go ahead. Can I ask about your response to their argument that another thing that's unique about this context is it's a little hard for the government not to, they would say, facilitate the abortion because they have custody of this minor. And so it's not the same as somebody who's, whether lawfully present or not, has been released into society. And it's not the same as adults in ICE detention because they assert an overriding interest in protecting her from her own decision. Your Honor, I'm not sure I understand the government's distinction between adults in ICE detention and unaccompanied minors, particularly where here J.D. has a court order saying that she has shown that the abortion was either in her best interest or that she's mature enough to make that decision. The government then has... Does that bind the federal government? No, Your Honor, that is by a state court. So they say we have, that's fine for purposes of state custodians. I don't know who the state would recognize as a custodian, but they say we have our own overrides of federal government. We have an interest with respect to these unaccompanied minors in making sure that decisions are safe and appropriate for them. Your Honor, they do have the requirement to ask in the best interest of minors, and I will say that they are not doing that with respect to J.D. when she has made a decision to have an abortion. She has a judicial bypass from a state court judge. What they are actually doing is supplanting their decision about what J.D. should do with her pregnancy. And that is not acting in her best interest, and that is actually a veto power over J.D.'s abortion decision, which the Supreme Court has said in Bilotti v. Baird that even parents can't do for their children, and in Planned Parenthood v. Casey that husbands cannot do for their wives. But it's not a full veto here because, the government would say, because there is the option of the sponsor. And the sponsor option is analytically akin to parental consent procedures. I realize there are differences, and you'd be right to point out some of those differences. But analytically, it is parental consent slows it down, burdens the right, but permissibly burdens it, the Supreme Court has said, so long as there's a bypass. Here, too, the sponsor option slows it down, in your view, burdens the right, takes some time, obviously. But if it can be accomplished quickly, wouldn't it be analytically akin to the parental consent cases that the Supreme Court has issued? Your Honor, it would not. For example, in Bilotti v. Baird, and in other cases relating to parental consent or parental notification, the Court has made very clear that any sort of alternative mechanism for a minor to effectuate her abortion decision must be expeditious and anonymous. And there must be very, very clear safeguards to ensure that the minor is not delayed in accessing abortion, and that she is able to do it quickly without notification to her family member, and also that she is able to effectuate her decision on her own. So I do not think it's akin to that. That raises the question again of whether the sponsor process can be expeditious. Yes, Your Honor. From my understanding, I would be quite surprised if we would be able to effectuate a sponsor decision in the same amount of time that a judicial bypass takes place. The Supreme Court has said that those must be very expeditious, and I would be surprised if the timeline could be similar in any way. So an HHS says you're dealing with someone 14, 15, 16, 17, he or she is 17 years old who is making a major life decision, who is in a detention center, who undoubtedly is anxious, scared, as you would be in a detention center at age 14, 15, 16, 17, and dealing with a major life decision. And that the sponsor, if one can be found, serves the same role in some respects as the adult in the parental consent, parental notification cases, who at least is someone, putting aside abuse hypotheticals, is someone the minor can talk to about this major life decision and get reassurance, get talked about options, get support. And so isn't the sponsor option in that sense serving some of the same purposes that the parental consent options, at least when they work properly, are designed to serve? Your Honor, the Supreme Court has said that there should be encouragement between parents and children in making these decisions, but there are some children who cannot involve their parents or for whatever situation, including abuse. And with respect to now that Judy has the judicial bypass, there are lower courts that have said that any sort of state interest in informing the parents or anyone is now distinguished. But this is not so much informing the parents, it's helping the minor. And I realize the minor may say, I don't need the help, which is, I understand that position, but the Supreme Court has said when you're a minor, the state can understandably structure the process so as to make sure it's an informed decision. And suppose we're in a state that doesn't have parental consent law, so the HHS in that circumstance really wants to make sure that the minor in this situation has had the opportunity to consult with an adult. Well, Your Honor, a couple of things. One, revelation of the abortion decision to anyone, including a sponsor by the government, also raises a host of constitutional issues, including informational privacy, as we raised in our complaint, as well as the Fifth Amendment right to abortion. But nevertheless, I understand that the instinct in, you know, as a parent, we all want our children to be able to talk to us and have someone, an adult that they can confide in. But here, where J.D., and we're specifically talking about J.D. on this emergency order, she has a bypass from a court that has found her mature enough to make the decision. Well, she also has a guardian ad litem. And she has a guardian ad litem, you're right. She's already got the adult. Yes, Your Honor, she does. And now we're talking about guardianship squared. Correct, and she also has an attorney ad litem also appointed for her in that process as well. So she has two adults that are working with her, acting in her best interest, and that she is confiding in. They have been with her every step of the way. They went with her yesterday to the counseling appointment. And they are acting in her best interest. Suppose we're in a state without parental consent and judicial bypass. Then there is no judicial approval, no finding that someone's mature enough. What then? Well, Your Honor, I think that in those states, they have made the decision to not enforce any sort of restrictions on access to minors. And I would say that those states have made that policy decision. And that's a good federalism answer, which is that this is really a state decision and the federal government should have no role. But I don't think the Supreme Court has ever said that the states have the exclusive authority in an issue like this where there's custody of a minor and the federal government might have an independent interest in ensuring that the decision is informed. It's not so much the parental rights side of it. It's ensuring that the child's, the minor's, the woman's decision is informed. And I realize there's opposition to those informed consent kind of laws. And I understand that completely, but the Supreme Court has upheld them. They have, Your Honor. And actually, in Planned Parenthood v. Casey, they do uphold an informed consent law with respect to information from the physician to the patient. But they've also been very clear that any sort of restriction on access to abortion, any informed consent law must be designed to inform the woman's decision, not to hinder it. So what we're here talking about today is the government's interest in potential life. And the question is, can they effectuate that interest by vetoing J.D.'s decision? We're not talking about providing or making sure that the abortion provider provides the proper information to J.D., which it has and will do. But we're talking about whether the government can veto her decision. I mean, she was appointed to Guardian Atlanta as part of the judicial bypass process? Yes, Your Honor. Okay. And so through that, she and the Guardian had talked and she had this consultation and she decided to continue her pregnancy. It was clear that HHS would then not require a second consultation to ensure that that was informed. Yes, Your Honor. So she wants more if she decides she wants an abortion. Yes, Your Honor. Absolutely. It's a sponsorship thing. That is right, Your Honor. And obviously, carrying a pregnancy to term has higher health risks. Childbirth is 14 times more dangerous than an abortion. HHS would be required then to see her through her prenatal care, delivered to her prenatal care. I'm not sure I'm following up on the initial big major decision. A decision is made either way, right? There's no non-decision option here. It's either to go forward with the pregnancy or to terminate the pregnancy. And so if I understand it, HHS was perfectly fine with relying on the Guardian-Ed Limon-Wightham decision if it leads to a decision to continue the pregnancy. But the question is whether we need, whether having the sponsorship process as an out, as a substitution for another layer of parental consent that only applies when we choose the abortion route. Yes, Your Honor. That is correct. Is the Guardian-Ed Wightham in this case someone who knew her before? She is not. How long did she just meet her through this process, meet him or her through this process? She met her through the, when she was appointed by the judicial bypass process, which began, I believe, it's now been about a month ago. Are sponsors always people who have known the people before? I believe there is a preference for sponsors that have a tie to the minor already. But if that doesn't work, apparently no one's come forward yet for six or seven weeks for JD. There can be sponsors who, bless their souls, are just willing to help people, almost like blessed parents, I guess. Is that right? My understanding that it's possible, but I think it's more difficult. But that is certainly something that I think everyone is considering for JD. I just saw something in the record that talked about we have plenty of sponsors who already are willing to continue the pregnancy and help with that. Correct, and that was with respect to another minor. I just wanted to make clear that wasn't with respect to JD. That was another minor that the Office of Refugee Resettlement Director went to personally meet with to talk to her about her pregnancy and, I believe, unfairly pressure her to carry her pregnancy to term. And so, if you don't have family members sort of stepping up or located early on, then the sponsorship process sounds to me like it understandably requires more vetting. Is it clear, is there any regulations or anything to talk about how that process works? Probably some, I hope some, even for family members. But for non-family, do we know how the process works and how long it takes? I believe there are. I'm not intimately familiar with them. I do understand it does involve a background check. I think it might even involve a home visit. And from what I've seen, at least, in working on this particular issue, that it does take some amount of time for that vetting process to happen, just as it would for a foster parent. They don't have lists of people who are already willing to do this by foster system sometimes, do they? I'm not aware of that list. I'm not aware of it, if there is one. Is there any background check done on the Guardian app item? No, Your Honor, there was not done on her. But under ORR policies, she is an attorney of record. The Guardian herself is an attorney. And both her Guardian ad litem and her attorney ad litem are attorneys of record that, under defendant's own admission, may have to be over Jane Doe. The government argues and cites Casey and other Supreme Court cases that say, as you're well aware, that the government may favor life over a abortion option. It has an interest in protecting the life of the unborn, according to Casey. That's an important and legitimate interest that lasts throughout pregnancy. Those are quotes from Casey. Not every law, which makes a right more difficult to exercise, is it so facto an infringement of that right. That's also a quote from Casey. How does the government, in your view, effectuate those principles in this circumstance, or how can they? Well, Your Honor, they are entitled to have a government interest in potential life, and the Supreme Court cases make that absolutely clear. But the Supreme Court cases also make clear that they cannot act on that interest if what they're doing is hindering access to abortion rather than informing the woman's free decision. Just to be very technical, unduly burdening. There can be burdens, the Supreme Court has said, like time, for example, but they can't be undue. Right, correct. So I guess two different pieces here. They can't act on their right to further their interest in life if it does so to burden in an undue way or create a substantial obstacle in the path of women seeking abortion. And with respect to that, I think that it's very clear here that what they're doing is not allowing J.D. to leave the shelter either with the shelter transport, which they're willing to do, or the guardian, and the government is not willing to transport themselves. So really what we're talking about is a ban on abortion for J.D., which the court has said you cannot, no matter how much of an interest the government has in potential life, you cannot act on that interest to ban abortion for anyone. It would become a tautology. Suppose HHS had a policy, which I understand is not the current policy, but suppose they had a policy that said our preference in these circumstances would be to find a sponsor. If a sponsor is found by 18 weeks of the pregnancy, we'll go with the sponsor option. If the sponsor is not found by 18 weeks or 20 weeks or 16 weeks, pick a date, and I know the date matters, then the minor will be in the same position as the adult detainee in an immigration facility so long as they have the state wall bypassed. Your Honor, the Supreme Court, in addition to finding that complete obstruction to access abortion, has also found that delays are also an undue burden. So just recently the Supreme Court decision, Holden's Health versus Hellerstedt, recognizes that if the government is imposing obstacles that create delays in access to abortion, that is also an undue burden and unconstitutional. Doesn't parental consent in practice, and I realize there's the bypass, but sometimes minor women are not necessarily going to the bypass right away, but doesn't parental consent in practice often take some time? Your Honor, it may, but there is always that bypass option that the Supreme Court has said must be expeditious and must be anonymous. So if it does seem like the parental consent option is taking some time, there is always that option. And here J.D. has no option. I take your point about the paper and the law and what it says and what the Supreme Court has said. I'm asking a question more about real world of, you know, someone who's 15 and the parental consent is required, but for the bypass, how quickly is every 15, 16, 17-year-old going to leap to court as opposed to going through them? And I would imagine that that process can be not only fraught, but also time-consuming in various cases, yet the Supreme Court has upheld that process many times. Yes, but only as long as there's also an expeditious state patch. There's always some alternative mechanism for a minor to seek an abortion on her own without her parent's permission. Do these options have to be some bypass for going to ask your parent's consent? Does it have to be something that's within the control of the pregnant minor? Your Honor, I do believe it does because otherwise there would be a veto power over her decision. And the Supreme Court has said that there has to be a mechanism, there has to be a way in which a minor can effectuate her abortion decision expeditiously without having to tell her parents. Right, 100 percent has to be her decision to go to bypass. Otherwise, it would be a de facto veto, and the Supreme Court said that's impermissible, right? Yes, Your Honor. That's your point. Yes. I just don't know how it works. How much role, control do minors in this situation have over the sponsorship process? I mean, they could say, here's the name of somebody. I just don't know that they have say input, or is it really in the hands of HHS, or I don't know if they appoint guardians or how it works. Your Honor, it's a good question. I certainly don't think it's a unilateral decision by the front-of-company minor herself. I think that ORR has a substantial role in vetting the sponsor, doing things like that. Right. I don't think that JD could all of a sudden say, I want to be with my extended family member in a different state, and that's who I want my sponsor to be and leave tomorrow. That is not how it works. And I'm hindered here by the lack of facts in the record on the sponsor process. But my understanding is that a lot of people who arrive in this country, minors, and I don't know the percentages, I don't know that anyone does, do have people that they have names and numbers of with them. Is that consistent with your general understanding, or is that off base? Your Honor, I actually don't know the answer to that. But I think even if they do arrive, there is, with family members' names in their pockets, there's still a process by which ORR has to undertake in order to effectuate that sponsorship. Right. And understandably, right, that they would have such a process. Yes. Is the ORR decision subject to any challenge review, or is it unreviewable? In terms of the sponsorship process? I'm not aware. I don't know the answer, Your Honor. If I may, no, please. Further points? Further points I just wanted to make in terms of the facilitation argument. Defendants really only need to step aside. This idea that somehow they have to approve the abortion by filling out some paperwork is completely unpersuasive. Really all that has to happen is that the Office of Refugee Resettlement needs to make a phone call to the shelter and say that the shelter may not transport the minor or that the guardian may do so. And that is what happened yesterday when J.D. was able to receive her counseling. And the idea that there's- Do they even need the call from ORR if they had a court order? I'm sorry? Do they need a call from ORR? No, Your Honor. But even just putting the court order aside for a minute in terms of the facilitation, the actual action that must happen with respect to the government is de minimis of nonexistent. And they're relying on cases that are completely opposite. They're relying on cases about facilitating abortion in the context of funding abortion in the Medicaid program or in Webster v. Repressive Health about whether a state could ban state hospitals from providing abortion. And neither case is on point. They are about the government making decisions in terms of funding or their actual facilities. And here what we're talking about is them standing in the way, and all they need to do is get out of the way. So I think the government says, and I want to give you a chance to respond, that those cases represent a principle or stand for a principle about the government, consistent with Supreme Court law, may favor childbirth over abortion. And the government does not want to be complicit in the abortion procedure. I think that's the theme that emerges from those cases. And you're quite right to point out the specific facts of those cases and what they stand for. But what is your response to their suggestion that they don't have to be complicit in the abortion, at least if there's an alternative mechanism? Your Honor, I would say that in this circumstance what they're doing is simply blocking the abortion by refusing to allow J.D. to leave with her guardian. And also that they have admitted in the context of ICE detention and the Federal Bureau of Prisons that they will and do facilitate abortion to the extent far greater than what we're asking for here. So it seems to completely undermine their argument that they have a state interest in not facilitating abortion whatsoever. Either J.D. is confined like a prisoner, or she is not and she should be able to go with her guardian. I would also like to say we haven't really talked about the harm very much. The government has a very heavy burden of showing irreparable harm here, and they cannot show that. What we're talking about here is an unaccompanied immigrant minor, 17 years old, pregnant, who has been forced to remain pregnant against her will for three weeks now because the government has blocked her abortion decision. Every day she remains pregnant takes a toll on her physical and emotional health. I want to interrupt you, but what was the date of the judicial bypass letter? September 25th. She was scheduled to go for her first counseling session on September 28th. It was September 27th that the federal government then prohibited the shelter from releasing her for any abortion-related appointments. And the harm to J.D. in this circumstance is irreparable. She's going to be pushed further later into her pregnancy. She's already been pushed from the first trimester into the second trimester. The further that we get, the further risks that are apparent for her, and also if we get so far, she'll be forced to carry this pregnancy to term against her will. At what point would you say that abortion will no longer be a safe option in this case? Texas bans abortions at 20 weeks in pregnancy. And she's 17 right now? She's about 15 approximately. Fifteen is what you said yesterday, right? Two days ago in the hearing, right? Fifteen weeks. Approximately 15. But, Your Honor, I would also say, and I think you recognize every day matters for J.D., it's been three weeks, and it's been three weeks too long. And balancing her harm compared to the government making a phone call, it's quite easy here. Can I ask more on the timing thing? So she got the counseling yesterday. One, is there any expiration date on that counseling, or will that continue to be valid for the next five weeks? They just need to get the date, if it were, to be approved for her to go. So, Your Honor, this is a complicated layer of Texas abortion restrictions. So Texas law requires counseling at least 24 hours in advance of the procedure by the same doctor who is to provide the abortion. Because of the limited availability of abortion in Texas, the same doctor is not always at the facility in South Texas. So, for example, the doctor that provided the counseling yesterday to J.D. is there today and on Saturday, but is not the same doctor who is there next week. So next week, there's a different doctor on Monday and Tuesday. And so if J.D. were allowed to have the abortion next week, she would have to be, unless this court declares otherwise, would have to be counseled again by this different doctor on Monday and wait 24 hours and have the abortion on Tuesday. So it is a complicated layer. Is it after Tuesday? Then we're looking at the following week. And the doctor that is there Thursday, Friday, and Saturday is the following week. But, Your Honor, we are really hoping we don't get that far. I thought there was one doctor who didn't do them after 15. After 15.6, and that's the doctor next week. And we're very concerned that she's on the cusp. And so even if she's able to go next week, that she may be past the limit for that particular doctor. I'm not sure this question affects the legal analysis, but I'm curious. Does someone from HHS or the detention facility travel with her? I know they're not the transporter, but does someone accompany or not? The shelter did yesterday. I don't believe that there's any requirement. And, in fact, the government has pointed to nothing that says that they are prohibited from allowing J.D. to be in the custody of the guardian. Certainly there's a law that says that J.D. cannot be released on her own recognizance, but that's not what we're asking for. And the shelter also, too, in terms of government facilitation, they are a government contractor. They are not the government. They have a broad contract to provide care to unaccompanied minors, and the shelter is willing to take her. And they should be allowed to take her, or the guardian should be allowed to take her. And that is really simply what we're asking. You mentioned something in your papers too I just wanted to clarify about. At some point she was going to have to travel much further away. Yes, Your Honor. And at what point is that? Seventeen weeks and six days. She will have to travel several hundred miles north to a different facility. And if she did that, would she have to go back and forth one day for counseling and one day for... Yes, Your Honor. She would have to make two trips unless there were arrangements for her to stay overnight in the city north of her, a couple hundred miles north of her. The round trip is several hundred miles. Anything else? No, Your Honor. Thank you. I've got a question. Going back to the school, is she not in school because she's pregnant? No, Your Honor. Her mobility has been restricted by ORR because of these issues, we believe. But I don't... That would be because she's pregnant. I'm sorry? That would be because she's pregnant. Because she's pregnant and seeking abortion. Okay. If she were pregnant, continuing her pregnancy, she could go to school. I don't think any of the minors in the shelter are going to school. But they have been going on outings, and she has been prohibited from going on those outings. Oh. Okay. Thank you very much. Thank you. We'll hear from the government on rebuttal. In quick response on the school point, Your Honor, she doesn't go to school, but my understanding is the shelter provides education at the shelter. They pretty much provide everything. It sounds like that's for all the... The minors' needs for the children at the shelter. Is it only minors in the shelter? I believe it's only for minors, Your Honor. So how does... Let me ask you just how... So they're providing schooling K through 12. Is that right? I think they are providing whatever schooling of the age of the children there that they need, yes, tailored to the children. I think there's a kind of individual educational plan. There's a lot of detail on both the sponsor process and kind of the whole ORR process on the ORR website that we cite in our brief, and that goes through a lot of the details of the sponsorship process and the procedures that they go through. How much control does she have over it? How much control does J.D. have over sponsorship process? I think the sponsorship process, when she arrived at the border, she had at least the name of one relative that she provided. That relative decided she did not want to sponsor, and then I think she also identified another individual later of family relations, but I believe because it was a kind of single male, there were some concerns about safety of having that individual be her sponsor. But I don't... To answer your question about how much control, I think they go through a normal process of vetting whether she has a right of refusal. I don't know about that. One more information. The ORR were going really slowly, and she wanted to speed it up. Well, I think that her and her attorney could definitely provide input and ideas of sponsors that I think ORR would be happy to consider. They could definitely play a part in this process to help, because otherwise trying to find somebody could take a lot of a problem. Do you know if they have a list of foster families that do this? I don't know about that, Your Honor. Do you know if, in general, there are people who volunteer around the country to be sponsors, or at least in the southwestern states? I don't know. I know the preference is generally to try to place them with family members or relatives that they identify when they arrive. But beyond that, I don't know, and I don't remember. I'm sorry if it's on the ORR website for information on that. What if, this is purely hypothetical, but what if ORR were arbitrarily denying sponsorship of anybody who would support the abortion decision? Is there any challenge, expeditious challenge that would be brought to that? How would she even know? Is she told why someone's rejected, and how would she challenge it? I don't know if she's told or if there's a right to challenge. There is, you know, there's certainly nothing in the procedures that indicates that there is such a policy that ORR would not release, and their preference is to try and find a sponsor here, and they've been trying. I'm sure it's a very difficult process for ORR. And just to address, we are in an unfortunate position here of the timing of this, because obviously, you know, we need the decision sooner rather than later. But part of the delay here has also been that plaintiffs filed two previous suits, and it's challenging before we got here into a correct form to challenge this. And so that's been part of the delay here in being able to adjudicate the issue. How does that impact? Just in terms of... Is that just a consequence she has to bear? No, but just in terms of the allegation of irreparable harm, and that here it's, you know, they brought two lawsuits before coming here, so part of the delay and the need for exigency here has been of their own making. Well, maybe they thought it would be faster to go to an existing lawsuit. Does that make the harm to her if she had to, as she alleged, that she had to continue with the pregnancy any less? No, I don't think it does, Your Honor. The harm is the same. The harm is the same. It's just a factor, I think, in terms of the exigency. And here, of course, if she were to get an order for the abortion, that would remove the case out, so it's not just temporary release. And in terms of opposing counsel, it's about having an escape hatch and no way here for safety, but the escape hatch here is a sponsorship for voluntary departure, and here she has the option to voluntarily depart, which then puts her in the same position as anyone else. And then there is nobody else. But that, again, raises the question, which is the government has told us to assume that she has the same, that she has constitutional rights. And if that's true, you normally, the answer to someone who has constitutional rights is not, oh, we can deny them, just leave the country. So really that assumption that you've made, and I understand why, but it does make it hard then for you to turn around and say, yes, assume she has constitutional rights, but also leaving the country is an option. Right. But, Your Honor, I think in terms of because we're not putting an obstacle in her path, we're declining to facilitate an abortion. And here, I think, although, of course, there is a custody issue, so it's not on all fours, but I think the Webster case is helpful in that, you know, in that case, there were definite practical effects about the state regulations and state law there that prohibited public employees from performing abortions. And even though that had practical limits on a woman's option, the court held that that was not a due burden. The government didn't have to. People had other options to go to. What other options does she have? Well, here she has voluntary departure or a sponsorship. Which she can't control. Well, she can play, I mean, voluntary departure is entirely. I'm assuming at this point that she's done everything she can to try to help identify somebody. So if there's nothing more she can do to help with the sponsorship process, let's assume that, then she has no control over that. Well, voluntary departure is entirely within her control. She can file for a request for voluntary departure at any time. And then she is out of, she will be out of HHS. If she were to at some point assert special juvenile immigration status, asylum, would that argument fall out for you, or would your position be the same? I would think then that would be raised in the removal process, or if she raised it in the immigration proceedings. It would be raised there. But I'm just saying, if she were to today say, I intend, normally I wait for a deportation order and then I assert my defenses. But if I were to say today I'm invoking a right under, not the Constitution, but under immigration law to stay in the United States, would you still make the same argument that her choice is to leave or not have an abortion? We would still make that argument. Again, I think it would be a much closer call in that situation. And we don't need to address it here because she has not raised any legal claims. What about, I guess I'm going back to a question I asked before then, the adult women who are in detention centers and are pregnant, they obtain the abortions. And under what you said about facilitation, the government is facilitating those abortions. Rather than saying we're not going to facilitate, you can leave the country if you desire. What are we to make of that difference in treatment and how that affects the weight of the facilitation argument or the you can leave the country argument? I think the considerations there are different in the ability to leave the country and the voluntary part. Why? I think there are some different rules involved. Why? What are the different rules? I don't think, sorry again, I'm not an immigration expert. I think voluntary departure is available to most of those people in ICE detention, but not all. And, again, I don't think it would be constitutionally required if there is an option of voluntary departure. No, it's not constitutionally required. Of course it's not constitutionally required. The point is, I think, as I'm thinking through it, the government has argued, consistent with the Supreme Court case law, we want to favor life over abortion. And the Supreme Court case law says you can have that general policy. And you say that it's a matter of implementing that principle. We don't want to facilitate abortion. And merely, plaintiffs would say, merely doing the paperwork you would say facilitates the abortion. But that happens in the adult detention situation. And there, as I understand it, and you can correct me if I'm wrong or file something to correct me if we're wrong about this, there the government does not say to the adult women that we're not going to allow you to have the abortion. If you want to leave the country, you can do so. I'm just trying to understand those two things together and how to make sense of the government's facilitation argument given those two things together. And I don't know why ICE has that particular policy that allows facilitation and why they've made that determination that they would permit and facilitate in those circumstances. But I don't think that's why. You're talking about ICE as if it's some separate, or it was one executive branch. And so ICE is part of the executive branch as is HHS. But there might be some reason in those detention circumstances and with the categories of people they have detained that they have made that determination that they need or want to facilitate in that circumstance. And I don't think that would require HHS to make the same determination where it chooses to promote categories and feel like here that it couldn't make a difference. I hear you on require. I'm just trying to explore. When we hear an argument from the government about the strength of an interest, one of the things we look at oftentimes is that being consistently applied, that interest. And that's one of the things I'm just asking questions about to explore. One more thing just to clear on the facilitation, the up-front facilitation that you call it of having the OR having to sign some paperwork before she can go authorizing it. If there were a court order directing her release into the custody of her guardian ad litem and attorneys for this procedure, would you still claim that ORR still has to authorize it? I don't think so because, for instance, your order if they comply with the district court PRO to take her to counseling yesterday even though they have made the decision to approve the abortion, which includes the counseling procedure. So they comply with the court order and she went to counseling. And just one last thing. You had promised me a regulation. Yeah. The other side cites it in there. Opposition is 45 CFR section 41.92A, and that provides that unaccompanied children who are victims of sexual assault while in federal custody can get access to abortion and other. I'm sorry, they're victims while in custody? I think while they're held in custody if they've been victims of sexual assault. Right. But what if, you know, you have a sex trafficking ring, and this is not uncommon, you bust up a sex trafficking ring, and there there are unaccompanied minors who came or were brought into the country without documentation. So they would not have gotten pregnant in custody. I'm not saying that the sexual assault has to occur in custody. I think that provision applies when they are in custody, then an abortion is made available for them. Okay. All right. That's my understanding. In the oral argument in this court, it is traditional for the judges to ask tough questions of all sides, and no one should assume that our questions represent our decision on the merits. The merits will be known soon enough. Thank you both for... Wait, wait, I have one very controversial question that is untouched. When did she come across the border? Where? When? When? Oh, I think it was September. September 7th. Okay. Thank you. Okay. Thank you to both sides for excellent arguments. The case is submitted. Stand please.
judges: Henderson, Kavnaugh, Millett